# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| AXCESS MARKETING GROUP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:09-CV-2107-B |
| | § | |
| WESTERN CREATIVE, INC. and | § | |
| MARK YOUNG, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Western Creative, Inc. and Mark Young's Motion for Summary Judgment (doc. 35), filed September 30, 2010. For the reasons stated below, the Court finds that Defendants' Motion should be and hereby is **GRANTED**.

## I.

## BACKGROUND[1]

This cases arises out of the termination of a business relationship between Plaintiff Axcess Marketing ("Axcess") and Service Corporation International ("SCI"), allegedly as a result of the tortious interference and business disparagement of Defendants Western Creative and Mark Young. SCI is a publicly traded company that owns funeral homes and cemeteries throughout the United States and Canada. (Jacobs Dep. 27:23-28:4). Sometime in 2007, Phil Jacobs, SCI's Chief Marketing Officer, approached Brad Kelly, Axcess' founder and loan shareholder and asked Kelly

---

[1]The Court takes its factual account from those uncontested factual allegations contained in the parties' papers and pleadings. Any contested fact is identified as the allegation of a particular party.

to renegotiate the advertising rates SCI paid for newspaper obituaries nationwide. (Kelly Dep. 32:14-33:16). Jacobs was a personal friend of Kelly's and a former employee at Axcess. (Jacobs Dep. 125:9-126:3). While prior to SCI's solicaitation Axcess had exclusively worked in radio advertising, Kelly agreed to begin negotiating and purchasing both print and radio advertising for SCI. (Kelly Dep. 33:3-34:10).

The precise nature of the Axcess–SCI relationship is a bit unclear. For the eight to twelve months following Jacobs and Kelly's conversation, Kelly traveled around the country trying to negotiate better obituary rates for SCI, all the while not being paid. (Kelly Dep. 17:10-24, 34:15-35:4; Jacobs Dep. 46:11-47:14). Both sides agree that thereafter, SCI and Axcess entered into a verbal agreement whereby Axcess would receive a 15% percent commission from any advertisements that it sold. (Kelly Dep. 70:17-71:23). The parties further agree that Axcess and SCI never entered into a written contract, that Axcess became an "approved vendor" at SCI, and that Axcess continued to provide its services to SCI until approximately March 2009. (*Id.* at 72:10-12; Jacobs Dep. 51:16-52:14). The parties do dispute, however, whether the agreement between SCI and Axcess was an exclusive purchaser agreement for print and radio ads. Kelly testified that the parties did enter an exclusive purchaser agreement. (Kelly Dep. 76:20-77:17). Defendants argue that no SCI representative has supported Kelly's assertion. (Defs.' Mot. Summ. J. 18-19).

Axcess' relationship with SCI initially involved a middleman, SWJ Advertising ("SWJ"). (Kelly Dep. 40:19-42:13). SWJ would direct Axcess to procure an ad with a certain newspaper or radio station on behalf of SCI; Axcess would then bill SWJ, who, in turn, would bill SCI. (*Id.*). However, when SCI terminated its relationship with SWJ in December 2008, Axcess began working directly with SCI. (*Id.* at 76:24-77:5). Axcess' relationship with SWJ is only relevant because of

certain payment issues that are presently in dispute.  In fact, other than the fifteen percent commission Axcess received under its oral agreement with SCI, there are are several payment practices involving Axcess and SCI upon which the parties dedicate great amounts of effort in explaining.  For one, for the first three months after SWJ was terminated, Axcess sent invoices without tear sheets, copies of ads, or any other documentation supporting its costs.  (*Id.* at 135:17-136:4).  During that period, SCI was also double-billed for Axcess' work, as SWJ mistakenly also sent SCI bills for January and February despite the fact that it was no longer doing work for the company.  (*Id.* at 156:5-22).  Jacobs and Kelly also testified that Axcess received three flat fee payments of $25,000 in each of its first three months with SCI, which was a retainer for covering start-up costs until Axcess began generating commissions.  (*Id.* at 256:1-257:18; Jacobs Dep. 242:7-24).  Finally, Kelly also testified that Axcess mistakenly double-billed some of the work it did buying radio ad time for SCI in certain smaller markets, charging SCI its full fifteen percent commission while also billing the radio station's ad agency for acting as its sales agent.   (Kelly Dep. 191:9-193:25).

Defendant Western Creative is an advertising company founded by Defendant Mark Young in 1995.  At some point in late 2008 or early 2009, Kelly approached Defendants and brought them into contact with SCI, believing that SCI needed someone with television advertising experience on their advertising campaign team.  (*Id.* at 93:19-96:22).  Before Defendants met with any SCI representatives, Kelly contends that he and Young entered an agreement whereby Western Creative would give Axcess one-third of its fifteen percent commission for buying television ads in consideration for Kelly bringing Young into the deal.  (*Id.* at 100:20-101:6).  For purposes of this Motion only, Defendants do not dispute this assertion.  (Defs.' Mot. Summ J. 9).  Western Creative began purchasing television ad spaces and creating direct response television ads for SCI in January

2009. (Young Dep. 85:3-87:8). Kelly testified that in the weeks immediately following, Western Creative "went behind Axcess' back" and attempted to negotiate print and radio advertising rates for SCI. (Kelly Dep. 110:4-111:25). Once again, for purposes of this Motion only, Defendants do not dispute this contention. (Defs.' Mot. Summ. J. 10).

The short-lived relationship between Axcess, Western Creative, and SCI began to sour in March 2009. In early March, Brad Kelly and Mark Young had a phone call concerning Young's frustration that Western Creative was only being compensated for its placement of television ads, not its creation of the ads themselves. (Kelly Dep. 163:7-165:23). While the parties agree this conversation took place, they disagree as to the exact nature of the phone call. Young alleges that Kelly told him to simply add a commission on top of the fifteen percent commission Axcess charged SCI, that SCI would never notice the extra charge, and that Western Creative would thereby get paid for its creative work. (Young Dep. 279:3-280:25). Kelly agrees that he mentioned the idea of adding a commission on top of Axcess' commission but contends that he admonished Young that this extra charge would have to be done with SCI's consent. (Kelly Dep. 168:1-169:4).

Following this conversation, Young contacted SCI to see if adding a commission on top of Axcess' commission was indeed okay. (Young Dep. 154:11-21). Russ Richmond, SCI's Managing Director of the Marketing Department who reported directly to Phil Jacobs, responded that it was not. (Id.; Jacobs Dep. 34:10-37:10). It is unclear from the record and highly disputed by the parties whether additional allegations were included in this conversation, precisely when the conversation was communicated to higher-ups at SCI, or what effect the conversation had on SCI's eventual decision to cease its business relationship with Axcess. Kelly testified that Young accused Axcess of double-billing SCI and paying kickbacks to Phil Jacobs. (Kelly Dep. 173:24-175:25). Axcess

argues that Young's accusations led directly to the auditing of Axcess' marketing practices and ultimately the loss of its business relationship with SCI. (Pl.'s Resp. 10-12). Defendants point to the testimony of Tom McConnell, SCI's Managing Director of Internal Audits, who testifies that he was originally contacted by an employee in SCI's Marketing Department who expressed concerns about billing from Axcess that had inadequate supporting detail, that while he was in this employee's office looking at the billing details, Russ Richmond walked in and informed McConnell of the conversation he had with Mark Young, and that McConnell thereafter decided to conduct an audit of Axcess' vendor account. (McConnell Dep. 14:1-17:15). This audit resulted in findings that SCI's marketing department had sloppily engaged Axcess without a written contract, that SCI's tracking of Axcess' expenses was lacking (resulting in overpayments of $400,000), and that SCI's marketing department improperly bestowed favorable treatment on Axcess. (Sangalis Dep. Ex. 140, at 1-2). The audit recommended that SCI's business relationship with Axcess "be wound down as soon as possible." (*Id.* at 2-3). Gregory Sangalis, SCI's corporate counsel and the administrator of the audit, testified that the statements made by Mark Young to Russ Richmond were irrelevant to the audit and were therefore disregarded. (Sangalis Dep. 63:3-64:22).

Following the termination of its business relationship with SCI, Axcess brought suit in the 44th Judicial District Court of Dallas County, alleging causes of action of tortious interference with an existing contract, tortious interference with prospective business relations, business disparagement, and breach of fiduciary duty. (Pl.'s Orig. Pet. ¶¶ 23-26). Axcess' Petition additionally seeks exemplary damages, attorneys fees, and pre- and post-judgment interest on the basis of those four primary causes of action. (*Id.* ¶¶ 27-29). On November 2, 2009, Defendants properly removed the case to this Court on the basis of diversity jurisdiction (doc. 1). Defendants

now bring their Motion for Summary Judgment (doc. 35), alleging that Axcess has not provided any admissible evidence to support necessary elements of each of her four causes of action and thus has failed to raise a question of material fact as required by Rule 56 of the Federal Rules of Civil Procedure.  (*See generally* Defs.' Mot. Summ. J.).

## II.

## LEGAL STANDARD

*A. Summary Judgment*

The purpose of summary judgment is "to enable a party who believes there is no genuine dispute as to a separate fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  Accordingly, Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[2]  The substantive law governing a matter determines which facts are material to a case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists.  *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990).  However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant need not

---

[2]The Court cites to the amended Rule 56, which became effective on December 1, 2010.  This amendment governs both any action filed after December 1, 2010 and any proceeding in an action pending as of December 1, 2010 unless the Supreme Court specifies otherwise or a court determines application of the amendment would be infeasible or unjust.  FED. R. CIV. P. 86(a).  The Court sees no reason why the amendment should not govern this case.  Accordingly, all citations to Rule 56 in this Order are to the amended version of the Rule effective as of December 1, 2010.

support its motion with evidence negating the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Id.* When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) (citing *Martin v. Alamo Cmty. Coll. Dist.*, 35 F.3d 409, 412 (5th Cir. 2003)).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the non-movant. *Little*, 37 F.3d at 1075. Nevertheless, a non-movant may not simply rely on the Court to sift through the record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the non-movant does provide must raise more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This evidence must be such that a jury could reasonably base a verdict in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

A party seeking or opposing summary judgment may rely upon depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or any other materials in the Record. FED. R. CIV. P. 56(c)(1)(A). However, for the Court

to consider any of these, the evidence offered must be of the type that would be admissible at trial. FED. R. CIV. P. 56(c)(2); *Joe Regueira, Inc. v. Am. Distilling Co.*, 642 F.2d 826, 829 (5th Cir. 1981).

B.      *Hearsay*

Hearsay statements are not admissible at trial unless covered by an exception under the Federal Rules of Evidence. FED. R. EVID. 802. A statement is hearsay if: (1) it is made by someone other than the declarant and (2) it is offered "to prove the truth of the matter asserted." FED. R. EVID. 801(c). A statement, though hearsay, will not be excluded by the hearsay rule if it falls within one of the several exceptions provided under the Federal Rules. *See* FED. R. EVID. 803 & 804. A hearsay statement that itself refers to another hearsay statement, termed "hearsay within hearsay," is admissible only if "each part of the combined statements conforms with an exception to the hearsay rule." FED. R. EVID. 805.

## III.

## ANALYSIS

Defendants have moved for summary judgment on each of Axcess' claims, alleging that Axcess has failed to provide any admissible evidence upon which a reasonable fact finder could find in its favor. The Court turns to each of the four causes of action alleged in Axcess' Petition in turn. With each, it is first necessary to examine the admissibility of the evidence offered to defeat summary judgment. After determining which evidence it may consider, the Court then turns to whether that evidence creates a question of material fact as to Defendants' liability.

A.      *Tortious Interference with Existing Contract*

Axcess first alleges that Western Creative and Young tortiously interfered with its preexisting exclusive rights contract with SCI. (Pl.'s Orig. Pet. ¶ 23). Under Texas law, the cause of action of

tortious interference with existing contract requires: (1) the existence of a contract; (2) a willful and intentional inference of the contract by defendant; (3) this interference proximately caused plaintiff's injury; and (4)plaintiff suffered actual damage or loss. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 664 (Tex. 1990). In moving for summary judgment on this claim, Defendants argue that Axcess has failed to raise a question of material fact as to the first element, whether an exclusive rights contract existed between Axcess and SCI, and the third element, whether Defendants' alleged interference proximately caused Axcess' injury. (Defs.' Mot. Summ. J. 18-23). With respect to both challenged elements, Defendants argue that Axcess cannot and does not present any admissible evidence, and, alternatively, that even if any evidence offered by Axcess is admissible, that evidence still fails to raise a question of material fact. (*Id.*). Axcess responds by providing evidence that it deems both admissible and sufficient to raise a fact question as to each element. (Pl.'s Resp. 7-12). The Court finds that Axcess has indeed presented sufficient admissible evidence to raise a fact question as to the existence of an exclusive purchaser agreement with SCI, nonetheless, this is not determinative on the summary judgment motion as to tortious interferenceon. This is because the Court also finds that Axcess has failed to raise a fact question on the issue of causation. Accordingly, Axcess cannot possibly recover on its tortious interference with existing contract claim, and Defendants' Motion for Summary Judgment as to that claim is **GRANTED**.

> i. Existence of an Exclusive Purchaser Agreement (Element 1)

Defendants first argue that Axcess cannot provide any admissible evidence that an exclusive purchaser agreement between Axcess and SCI existed. (Defs.' Mot. Summ. J. 18-19). Axcess responds by citing to places in Kelly's deposition where he states that Jacobs told him that Axcess

had an exclusive rights contract for print and radio advertising. (Pl.'s Resp. 7-8). Defendant replies that this evidence is inadmissible hearsay and that Axcess therefore cannot demonstrate that the parties ever had a "meeting of the minds" or entered into an oral contract. (Defs.' Reply 3-4).

The Court first turns to the admissibility of Axcess' evidence and notes that it is unconvinced by Defendants' hearsay arguments. Testimony regarding a verbal act, "an utterance of an operative fact that gives rise to legal consequences," is not hearsay when offered for the purpose of demonstrating that a statement was made, not that what was said was true. Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.11[3] (2d ed. 2010). Accordingly, testimony concerning what the contracting parties said about the creation of terms of an oral agreement are nonhearsay verbal acts. *Id.*; *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994); *Moen v. Thomas*, 627 N.W.2d 146, 150-51 (N.D. 2001); *Pool Co. v. Hydra-Rig, Inc.*, 626 S.W.2d 320, 323 (Tex. App.–Fort Worth 1981, no writ). Kelly testified that Jacobs indicated to him that SCI and Axcess were entering an exclusive rights agreement. (Kelly Dep. 77:20-24). Since Defendants' hearsay argument is the only basis for their contention that Axcess has failed to raise a fact question regarding the existence of a contract, the Court finds that summary judgment on that basis is improper.

ii.      Proximate Causation (Element 3)

Defendants next argue that Axcess cannot provide any evidence that any interference on Defendants' part proximately caused the damage Axcess suffered. (Defs.' Mot. Summ J. 19-23). Axcess responds by citing to a host of deposition testimony and other evidence that it contends demonstrate that Defendants' interfering conduct proximately caused the termination of its contract with SCI. (Pl.'s Resp. 7-12). In Reply, Defendants once again argue that the statements offered by

Axcess are inadmissible hearsay, and even if they were admissible, do not possibly show that Defendants' conduct proximately caused Axcess' injury. (Defs.' Reply 4-8). The Court first turns to Defendants' assertion that the evidence offered by Axcess is inadmissible hearsay, determining what testimony is indeed inadmissible and what evidence it may consider in its analysis. The Court then takes the admissible evidence, views it through the lens of the summary judgment standard, and concludes that Axcess has failed to raise a fact question as to whether Defendants' interference proximately caused Axcess' injury.

In determining whether the evidence offered by Axcess is inadmissible hearsay, the Court examines the offered testimony piece by piece. The first category of evidence Axcess offers is a line of testimony from Kelly's deposition that Axcess argues demonstrates that Defendants interfered with its exclusive purchaser agreement with SCI. Kelly testified that within weeks after Axcess and Western Creative began their business relationship, Kelly learned that Western Creative went behind its back and presented proposals for print and radio ads to SCI, despite Axcess' exclusive rights contract with SCI. (Kelly Dep. 110:1-13; 111:9-112:2). Defendants stipulate, for purposes of summary judgment, that this occurred. (Defs.' Mot. Summ. J. 10). Thus, while it is unclear whether these statements are based on Kelly's personal knowledge, for purposes of this Motion, they are deemed **ADMITTED**.

The second category of evidence surrounds Kelly's deposition testimony about what Jacobs told him following Young's contacting SCI representatives about Axcess' conduct. Kelly testified that Jacobs told him that he (Jacobs) was "being accused of receiving kickbacks [and] of allowing you [Kelly] to double-bill our business." (Kelly Dep. 174:1-3). Kelly further testified that Jacobs told him, "I'm not happy about it and it's apparently the partner that you brought in is–is starting a lot

of questions." (*Id.* at 174:8-10). Axcess also offers Kelly's statement that Jacobs told him that he (Jacobs) was first questioned on the rate he was paying Axcess for advertising, that Mike Webb, SCI's CEO, said "What if I told you Western could by the media cheaper," and that Webb concluded "that I [Jacobs] was being accused of Western–of double billing on the radio." (*Id.* at 174:20-175:1). Kelly testified that he understood this last statement to mean that "Mark Young has suggested that I [Kelly] was receiving commissions on both sides. (*Id.* at 175:5-6).

None of these statements from the second category of evidence offered by Axcess are admissible. In each instance, the relator, Kelly, had no personal knowledge of the statements being made. Each statement is offered either for the purpose of demonstrating that Young made statements to SCI representatives or to show that SCI representatives were upset that Young's statements caused problems for Jacobs and Young. They are therefore offered to demonstrate the truth of the matter asserted and are inadmissible hearsay. While Axcess does not argue that any of these statements fall under an exception to the hearsay rule, the Court notes in passing that they do not. None of the statements is a nonhearsay admission because neither Jacobs nor SCI is a party opponent. *See* FED. R. EVID. 801(d)(2). While Kelly did testify to certain statements made by Young and Young is a party opponent, the double hearsay rule serves to preclude admission of this evidence because Young's statements are coming via Kelly via Jacobs via an SCI representative. While the SCI representative could potentially testify as to Young's admission, the others could not. Neither do any of Kelly's statements come under the hearsay exception for statements against interest. In order for that exception to apply, the original declarant must be unable to testify, and there is no evidence that Young, let alone Jacobs or the SCI representative, are unable to testify. *See* FED. R. EVID. 804(b)(3).

Axcess' third category of evidence involves several statements made by Jacobs in his deposition. Axcess first alleges that Jacobs "was informed in late March or early 2009 that Young had spoken with Tom McConnell, an SCI internal auditor who was conducting the Axcess Marketing audit, and accused Jacobs of having knowledge that Axcess Marketing was improperly double billing SCI." (Pl.'s Resp. 10). However, this statement is not supported with a citation to Axcess' Appendix, and after scouring Axcess' Appendix, the Court was unable to find any testimony (other than Kelly's testimony discussed above) stating as much. The Court did find three statements from Jacobs in Axcess' Appendix that potentially go to the issue of interference and proximate causation. First, Jacobs did testify that Young told him that Kelly had suggested that Western Creative charge a commission on top of Axcess' without SCI's knowledge. (Jacobs Dep. 119:2-23). However, this testimony is another example of inadmissible double hearsay: Jacobs testified to something that Young told him was said by Kelly. Second, Jacobs also testified that he was not aware of a single instance of double billing, fraudulent billing, or kickbacks by Axcess. (*Id.* at 105:18-106:6). This piece of testimony is not hearsay and is **ADMITTED** for purposes of this Motion. Finally, Jacobs testified that McConnell told him that "if it weren't for [Young's] comment, there may not have been the need to have an internal audit." (*Id.* at 116:6-9). This too is hearsay, as Axcess offers the testimony as truth for the proposition that Young's comments caused the internal audit.

The evidence properly before the Court for summary judgment is therefore limited to the following: (1) Kelly's testimony that within weeks of Western Creative beginning to do business with Axcess and SCI, Defendants discretely presented proposals to SCI for print and radio ads; and (2) Jacobs' testimony that he is not aware of a single instance of double billing, fraudulent billing, or

kickbacks by Axcess. Defendants argue that Axcess has failed to raise a fact question on proximate cause because Axcess has not offered any evidence that SCI ceased its business relationship with Axcess because of anything Defendants said or did. Defendants further offer several pieces of admissible evidence to support its contention that SCI ended the relationship for other reasons. (*See* Defs.' Mot. Summ. J. 20-23). Axcess only argues that Young's statements to SCI caused SCI to terminate their business relationship. The Court could find no evidence or argument offered by Axcess that Defendants' "going behind Axcess' back" in anyway caused SCI's actions. Thus, the first piece of admissible evidence is inapposite as to causation. Neither does the evidence that Jacobs is unaware of misconduct by Axcess have any bearing on why Axcess was ultimately terminated by SCI. Indeed, the only evidence that might indicate that SCI terminated Axcess because of Young's comments is the inadmissible hearsay discussed above.[3]

Because Axcess has offered no admissible evidence that Defendants' conduct proximately caused the termination of its business relationship with SCI, Axcess has failed to rase a fact question on its claim for tortious interference with existing contract, and Defendants' Motion for Summary Judgment as it relates to that claim is **GRANTED**.

B.     *Tortious Interference with Prospective Business Relations*

Axcess also alleges that Defendants tortiously interfered with the future business it would have had with SCI. (Pl.'s Orig. Pet. ¶ 24). The elements of a claim of tortious interference with prospective business relations are: "(1) a reasonable probability that the parties would have entered

---

[3]Even if the Court were to accept some of the hearsay testimony offered by Axcess, it is not convinced that such testimony would raise a question of material fact either–while such evidence might go to the cause of SCI's own internal audit, Axcess has not offered any evidence that, even when construed in the light most favorable to Axcess, indicates that SCI terminated the relationship because of Young's statements and not the result of SCI's own internal audit.

into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex. App.–Houston [1st Dist.] 2009, pet. denied) (quoting *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.–Houston [1st Dist.] 2006, pet. denied)). The parties generally raise the same arguments for and against summary judgment on this claim as they do on Axcess' tortious interference with existing contract claim. Importantly, the parties make the same arguments, and Axcess relies on the same exact faulty evidence, in attempting to demonstrate whether or not Defendants' interference caused Axcess to lose future business. (*See* Defs.' Mot. Summ. J. 24; Pl.'s Resp. 6-12). Axcess faces the same admissibility hurdles with this claim as its claim based on any existing contract. Furthermore, the evidence that is admissible does not support a prospective business relationship claim any more than it does a previously existing contract claim. Accordingly, Axcess has failed to raise a genuine issue of material fact as to one of the necessary elements of its tortious interference with prospective business relations claim, and Defendants' Motion for Summary Judgment with respect to that claim is **GRANTED**.

C.      *Business Disparagement*

In Count 3 of its Original Petition, Axcess alleges that Defendants' statements to SCI about Axcess constitute business disparagement.[4]  (Pl.'s Orig. Pet. ¶ 25).  In Texas, a plaintiff seeking to recover on a business disparagement claim must demonstrate that "(1) the defendant published false and disparaging information about it; (2) with malice; (3) without privilege; (4) that resulted in special damages to the plaintiff.  *Forbes Inc, v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).  In order to prove special damages, a plaintiff must show that a defendant's communications "play[ed] a substantial part in inducing others not to deal with the plaintiff" and that plaintiff suffered some pecuniary los, in the form of loss of trade or other dealings, as a result.  *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987).  In moving for summary judgment, Defendants argue that Axcess has failed to raise any admissible evidence as to whether the statements Young made to SCI were false and whether Axcess suffered special damages.  (Defs.' Mot. Summ. 25).  Axcess responds that it has raised a fact question as to both elements.  (Pl.'s Resp. 13).

The Court need not consider the issue of whether Axcess has raised a fact question as to the falsity of the statements because summary judgment is proper based on special damages alone.  Once again, Axcess cites the same statements it made in support of its tortious interference with existing contract claim as supporting its business disparagement claim as well.  However, those statements are no more admissible on the business disparagement claim as they are on the tortious inference claims.  Neither do the pieces of admissible evidence provided by Axcess go to the question of

---

[4]While it is unclear from Plaintiff's Original Petition precisely what cause of action Count III is based upon, it appears to the the parties appear to agree that Axcess is accusing Defendants of business disparagement.  Business disparagement is the only basis upon which either party has presented arguments in their briefing.  While Axcess does also list the elements of slander in its Response, it leaves its discussion at that, not making any arguments based upon that cause of action or even stating that Defendants have failed to address it.

whether Defendants' statements "play[ed] a substantial part in inducing [SCI] not to deal with the plaintiff." *See Hurlbut*, 749 S.W.2d at 767. Just as that evidence does not raise an issue of material fact as to whether Defendants' alleged interference proximately caused Axcess' termination by SCI, it does not show that Defendants' statements were a substantial part of SCI's decision. Accordingly, Defendants' Motion for Summary Judgment, with respect to Axcess' claim of business disparagement, is **GRANTED**.

      D.     *Breach of Fiduciary Duty*

Finally, Axcess alleges that it entered a joint venture with Western Creative for the purpose of expanding the representation of SCI and that Defendants' subsequent soliciting print and radio advertising business from SCI constituted a breach of fiduciary duty. (Pl.'s Orig. Pet. ¶ 26). In Texas, the elements for breach of fiduciary duty consist of: (1) the existence of a fiduciary relationship between plaintiff and defendant; (2) a defendant's breach of the fiduciary duty it owed plaintiff; and (3) the breach either caused injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.–Dallas 2006, pet. denied)). Under Texas partnership law, a fiduciary relationship exists between partners in a partnership or joint venture. *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998). Partners also owe a fiduciary duty to the partnership or joint venture itself. *Id.*

Defendant, in moving for summary judgment on Axcess' breach of fiduciary duty claim, argues that the parties never entered a joint venture, that Axcess has provided no admissible evidence that indicates a joint venture existed, and that even if a joint venture did exist, Axcess has once again failed to offer evidence that any breach actually caused its injuries. (Defs.' Mot. Summ.

J. 25-28).  Axcess responds to Defendants' first two arguments, contending that there is evidence that the parties entered a joint venture but fails to rebut Defendants' arguments concerning causation.  (Pl.'s Resp. 13-16).  This oversight by Axcess is immaterial in the instant case, however, because compared to the three previous causes of action, a breach of fiduciary duty claim allows a plaintiff to show either that its injuries were caused by the breach or that a defendant has benefitted. *See Navigant Consulting*, 508 F.3d at 283.  Here, Defendants have not argued that they did not benefit from Young's alleged solicitation of SCI's print and radio business.  Summary judgment on that basis is therefore improper, and the only issue before the Court is whether Axcess has raised a question of material fact as to whether the parties entered into a joint venture.

Texas law defines a partnership[5] as "an association of two or more persons to carry on a business for profit as owners."  TEX. BUS. ORGS. CODE § 152.051(b).   In determining whether a partnership was formed, courts looks to five factors: (1) the receipt or right to receive a share of profits, (2) the expression of an intent to be partners, (3) the right to participate in control of the business, (4) an agreement to share losses or liabilities, and (5) an agreement to contribute money or property to the business.  TEX. BUS. ORGS. CODE § 152.052(a); *Ingram v. Deere*, 288 S.W.3d 886, 894, 898-903 (Tex. 2009).  No one factor is dispositive, and courts apply a "totality of the circumstances test" in their formation analysis.  *Ingram*, 288 S.W.3d at 898.  Under this test, conclusive evidence as to all five factors establishes the existence of a partnership as a matter of law. *Id.*  Likewise, the absence of all five factors preludes the recognition of a partnership as a matter of

---

[5]The parties spend a great amount of effort arguing over whether the standard for partnerships or joint ventures applies.  However, the Texas Supreme Court has explicitly stated that for purposes of entity formation, there is "no legal or logical reason for distinguishing a joint venture from a partnership."  *Ingram v. Deere*, 288 S.W.3d 886, 894 n. 2 (Tex. 2009).

law.  *Id.*  When a plaintiff offers conclusive evidence of just one factor, that "normally is insufficient to establish the existence of a partnership."  *Id.*

In response to Defendants' allegation that it cannot provide any evidence to support its contention that the parties entered a joint venture, Axcess offers three categories of evidence.  (Pl.'s Resp. 14-15).  First, Axcess provides the testimony of Brad Kelly, who stated, albeit in rather uncertain terms, that he and Mark Young "agreed to have a partnership on my bringing him in" with SCI and that the two of them "talked about what our partnership and what our agreement as partners would be."  (Kelly Dep. 99:19-24; 104:12-16).  Axcess also points to its fee splitting agreement, wherein the 15 percent commission generated by Western Creative's television ad placement for SCI would be divided two-thirds to Western Creative and one-third to Axcess, though it does not direct the Court to which factor this evidence is offered in support of.  (Pl.'s Resp. 14; Kelly Dep. 100:20-101:15).  Finally, Axcess argues that its reputation opened the door for the joint venture with SCI and that this reputation therefore constitutes property contributed to the partnership.  (Pl.'s Resp. 15).

The Court notes from the outset of its analysis of the evidence offered by Axcess that no evidence was offered concerning either the parties' right to participate in the control of the business or any agreement to share losses or liabilities.  Furthermore, Axcess agrees that its fee-splitting agreement with Western Creative does not constitute a profit-sharing agreement and makes no further argument concerning the profit sharing factor.[6]  Axcess' argument that its reputation

---

[6]The Court draws this conclusion from a couple of Axcess' statements.  First, Axcess argues extensively that profit sharing is not controlling or required to demonstrate that a joint venture exists.  Second, Axcess refers to the fee splitting as "income" to be "divided" and never once argues that the income was shared.  Sharing income or "gross revenue" is not profit sharing under Texas Partnership Law.

constituted property that it contributed to the partnership is unavailing because, while reputation may sometimes constitute property contributed to a partnership, Axcess has presented no evidence, only argument, that it had a good reputation that could be considered capital for the joint venture. Indeed, Axcess does not include a single citation to the Record in its discussion concerning its reputation. (*See* Pl.'s Resp. 15). Absent any evidence as to reputation, the Court cannot accord any weight to Axcess' arguments—to do so would allow any business alleging the formation of a joint venture to present supposed evidence of the fifth factor by offering a similarly bald assertion that its reputation was property contributed to the partnership. Having found that Axcess fails to raise any evidence as to four of the five factors of partnership formation, the Court turns to the lone remaining factor, the expression of an intent to be partners.

In looking at the "expression of an intent to be partners" factor, courts should only examine evidence that is "not specifically probative of the other factors." *Ingram*, 288 S.W.3d at 900. In other words, courts must not use this factor as a "catch-all" for evidence of the other four factors, as doing so would effectively "eviscerate" the separate expression of intent factor. *Id.* Courts center their analysis of this factor on the parties' speech, writings, and conduct. *Id.* at 899. Examples include "the partes' statements that they are partners, one party holding the other party out as a partners on the business's letterhead or name plate, or in a signed partnership agreement." *Id.* at 900. However, "[t]he terms used by the parties in referring to the arrangement do not control," and the mere reference to another person as a "partner" is not enough. *Id.* This is especially true given

---

*Ingram*, 288 S.W.3d at 899. Furthermore, the absence of any explicit contention that the fee-splitting arrangement was in fact profit sharing indicates that Axcess did not intent to argue as much.

the fact that the term "partner" is a common term that may be used in a variety of ways. *Id.* In other words, in determining the effect of a party's use of the words "partner" or "partnership," courts should not take the words at face value, but should instead examine "the testimony used by the putative partners, the context in which the statements were made, and the identity of the speaker and listener." *Id.*

In support of its arguments concerning the expression of intent factor, Axcess cites to Kelly's testimony that he and Mark Young "agreed to have a partnership on my bringing him in" with SCI and that the two of them "talked about what our partnership and what our agreement as partners would be." (Pl.'s Resp. 14-15). Defendants argue that this testimony is unclear, both in the face of other statements made by Kelly and the context of the very statements offered by Axcess. (Defs.' Reply 12-14). The Court agrees with Defendants and finds this evidence alone could not lead a reasonable jury in applying Texas law to conclude that the parties entered a joint venture.

Kelly's statements that the parties spoke of themselves as "partners" entering a "partnership" is precisely the type of non-controlling, conclusory testimony the Texas Supreme Court has admonished against and rejected. In *Ingram*, the testimony relied upon by Defendant Deere in trying to demonstrate that he and Plaintiff Ingram entered a partnership was the following: Question from counsel: "What representations did [Ingram] make to you when you were forming this idea that later turned out to be not true?" *Ingram*, 288 S.W.3d at 901. Deere's answer: "Well, that number one, that this was a joint venture, or that we were partners, or we were doing this together." *Id.* Deere further testified that partner "means some people working together." *Id.* The Court noted that Deere failed to present evidence of any other conduct that expressed intent. *Id.* The Texas Supreme Court, in upholding the District Court's finding that no reasonable jury could find for

Deere based on the evidence provided, concluded that "Deere cannot provide the content, context, or circumstances to give any of the alleged expressions of intent legal significance as evidence of a partnership." *Id.* The Court particularly noted that the testimony proffered by Deere was unclear, gave a variety of names for the parties' relationship, and failed to clearly provide what Ingram believed the nature of the parties' relationship to be.

When taken in context, Kelly's statements are as equally confusing and ambiguous as the statements offered by Deere and similarly fail to offer any legal significance on the question of partnership formation. The immediate context of Kelly's deposition indicates that Kelly himself is unclear what words were used in the conversations between and Young. While Kelly's deposition is replete with confusing and conflicting testimony concerning the nature of the parties' relationship, the Court finds two statements particularly insightful. First, when asked whether Young referred to their relationship as a partnership, Kelly replied, "I can't remember if that was the exact word, but I—the assumption or the definition of it was conveyed, that we were together going to work on the [SCI] business." (Kelly Dep. 105:4-7). On its own, an agreement to work together does not mean that a legal partnership has been formed. Otherwise, virtually every business relationship could be considered a legal partnership. Kelly further testified, "I thought that was our agreement, I handle the print and radio and he handles the TV." (Kelly Dep. 101:12-15). This statement on the scope of the partnership is rendered wholly confusing and ambiguous by the context of other statements Axcess made over the course of this litigation. In its Original Petition, Axcess stated that it entered a "joint venture" with Western Creative "for the purpose of expanding the representation of SCI." (Pl.'s Orig. Pet. ¶ 26). In Axcess' Response to Defendants' Motion for Summary Judgment, Axcess (and its lone shareholder Brad Kelly) changed course, stating that the purpose of the parties' "joint

venture [was] for the representation of SCI for television ads." (Pl.'s Resp. 14). This statement flies in the face of Kelly's statement above that their agreement was that Defendants would separately handle television while Axcess would continue to solely and exclusively handle print and radio. Perhaps most important and indicative of the confusion and ambiguity surrounding Kelly's deposition statements is a separate statement made in an email sent by Axcess representative Dave Riatti, Brad Kelly's childhood friend who has worked for Axcess since its inception, wherein Riatti states that Axcess views Western Creative not as a business partner, rather as "our vendor as we originally introduced them to SCI." (Kelly Dep. Ex. 47, at 1).

When combined with the fact that Axcess has offered no other evidence of conduct that could be considered an expression of intent, let alone no evidence of conduct that would go to any of the four other factors, the two statements offered by Axcess are not enough. When taken in the context of the rest of Kelly's deposition and statements by Axcess and its representatives during litigation, these two statements sound hollow, offering little more than the terms "partner" and "partnership." On two separate occasions, the Texas Supreme Court has stated that the use of those words alone is not enough to satisfy the expression of intent factor. *See Ingram*, 288 S.W.3d at 900 ("The terms used by the parties in referring to the arrangement do not control . . . and merely referring to another person as 'partner' in a situation where the recipient of the message would not expect the declarant to make a statement of legal significance is not enough." (internal citation omitted)); *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 288 (Tex. 1978) ("We are not persuaded by the description of the relationship in the advertising material. Just as the words used by the parties in a contract do not necessarily control the substance of the relationship, the terms used by the parties in referring to the arrangement do not control.").

Axcess has failed to present "legally sufficient evidence," let alone "conclusive" evidence, of any of the five factors the Court considers in determining whether a partnership has been formed. Accordingly, the court concludes that Axcess has failed to offer sufficient evidence from which a reasonable jury could conclude that the parties entered a joint venture and has thereby also failed to raise a question of material fact as to whether Defendants owed it a fiduciary duty. Defendants' Motion for Summary Judgment as to Axcess' breach of fiduciary claim is therefore **GRANTED**.

## IV.

## CONCLUSION

Defendants' Motion for Summary Judgment as to each of Axcess' causes of action is hereby **GRANTED**. Accordingly, all of Axcess' claims against Defendants are hereby **DISMISSED**.[7] The trial setting and pretrial conference set for May 16, 2011 and May 13, 2011, respectively, are hereby **VACATED**.

**SO ORDERED.**

**DATED February 16, 2011**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[7]The Court need not examine Axcess' claims for exemplary damages, attorneys' fees, and interest asserted in Counts 5-7 of its Original Petition because each is dependent upon Axcess' ability to recover under Counts 1-4. (_See_ Pl.'s Orig. Pet. ¶¶ 27-29).